CHARLES VEREECKE,

       Plaintiff,

v.

HURON VALLEY SCHOOL DISTRICT, ET
AL,

       Defendants.

_____/

Case No. 07-13700

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [32]**

Plaintiff Charles Vereecke brings this civil rights action alleging that Defendants
retaliated against him in violation of 42 U.S.C. § 1983 because he filed a previous lawsuit
on his daughter's behalf against one of her former high school teachers, the Huron Valley
School District, and the principal of her high school, Michael Krystyniak. That lawsuit
alleged that the former teacher "manhandled" his daughter on May 30, 2006, broke her
wrist during attempted horseplay, and caused her to miss the girl's softball district playoffs.
It asserted a claim of gross negligence against his daughter's high school principal and
former high school teacher and a claim of sexual harassment, in violation of Michigan's
Elliott-Larsen Civil Rights Act. At the close of discovery, the case was evaluated for
$31,000 ($30,000 against the former teacher and $1,000 against the District and Principal
Krystyniak). All parties accepted the case evaluation award, and the lawsuit was dismissed

with prejudice on August 6, 2007. (Defs.' Ex. 3.) On August 31, 2007, Plaintiff filed this action.

This matter is before the Court on Defendants' motion for summary judgment. For the following reasons, Defendants' motion is GRANTED.

## I. Facts

Plaintiff is an English teacher at Milford High School and has been for over 34 years. He was also the athletic coordinator for Milford High School for over 20 years. Prior to filing the lawsuit on his daughter's behalf, he had never been disciplined. (Krystyniak Dep. at 7.)

Four key events provide background to Plaintiff's § 1983 action. The first is the previous lawsuit Plaintiff filed in state court on behalf of his daughter. It is that lawsuit that gives rise to Plaintiff's retaliation claims in this action. The second involves Plaintiff's involvement in a dispute between some of the parents on the girl's basketball team with the coach of that team, Don Palmer, who has been a lifelong friend of Plaintiff. (Pl.'s Dep. at 15.) The third involves Plaintiff's conduct at a February 9, 2007 basketball game between Milford High School and Lakeland High School. The fourth involves Plaintiff's removal of a Pepsi cooler from the school in June 2007. Defendants assert that the actions Plaintiff calls retaliation were instead legitimate responses to his conduct, none resulted in a materially adverse change in the terms and conditions of his employment, and none were based in any way on the fact that Plaintiff had filed a lawsuit on his daughter's behalf.

## A. Underlying Lawsuit

On October 11, 2006, Plaintiff, on behalf of his daughter, filed a complaint in state court against the Huron Valley School District, Principal Krystyniak, and a former teacher at his daughter's high school. That lawsuit alleged that the former teacher "manhandled" his daughter on May 30, 2006, broke her wrist during attempted horseplay, and caused her to miss the girl's softball district playoffs. It asserted a claim of gross negligence against his daughter's high school principal and former high school teacher and a claim of sexual harassment, in violation of Michigan's Elliott-Larsen Civil Rights Act.

On the last day of school in June 2006, Plaintiff told Principal Krystyniak that he intended to file a lawsuit on his daughter's behalf. (Krystyniak Dep. at 8, 85-86.) Principal Krystyniak did not know that Plaintiff was going to name the School District or him in this potential lawsuit. Based on his conversation with Plaintiff, he believed the lawsuit would be brought solely against Stolz, the teacher who broke his daughter's wrist. (*Id.* at 86.)

The underlying lawsuit, when filed, specifically alleged the following. Prior to May 30, 2006, the former teacher, Charles Stolz, had "engaged in unwanted physical conduct" with female students at Milford High School on multiple occasions. Students, parents, and teachers complained about Stolz to the administration at Milford High School, including Principal Krystyniak, and Stolz had been informed before May 30, 2006 that his teaching contract would not be renewed for the 2006-2007 school year. (State Compl. at ¶¶ 9-11.) Nonetheless, Stolz was allowed to complete the 2005-2006 school year, and, on May 30, 2006, "presumably in an effort at horseplay, manhandled" Plaintiff's daughter, breaking her wrist. (*Id.* at ¶ 13.) As a result, Plaintiff's daughter was unable to compete in the softball districts as a member of Milford High School's girls' softball team, suffered damages, and Plaintiff sought relief in the form of money damages. (*Id.* at ¶¶ 17-19, 33-35.) It was further

alleged that, because the Huron Valley School District administration, including Principal Krystyniak, was aware of Stolz's actions "directed at the female student population at Milford High School" for several months before he broke Plaintiff's daughter's wrist, they had violated Michigan's Elliott-Larsen Civil Rights Act which defines sexual harassment as "physical conduct or communication of a sexual nature which has the purpose or effect of substantially interfering with an individual's education and/or creating an offensive, hostile, and intimidating educational environment." (*Id.* at ¶¶ 21-27.) Because of their failure to take timely action, Plaintiff's daughter suffered injuries and thus sought an award of money damages. (*Id.* at ¶ 28-29.)

During the course of litigation, it was discovered that two female students at Milford High School had made complaints before the May 30, 2006 broken wrist incident. Their complaints were that Mr. Stolz made inappropriate comments of a sexual nature. Principal Krystyniak was aware of these complaints. (Pl.'s Ex. C, 1/17/06 letter from Chrissy Stevens; Krystyniak Dep. at 41-50.)

### B. Plaintiff's Year-to-Year Contract as Athletic Coordinator

Plaintiff was the athletic coordinator for Milford High School for over 20 years. This is an extracurricular activity outside Plaintiff's teaching duties, similar to coaching, for which he received extra compensation. (Krystyniak Dep. at 29.) Plaintiff described his duties as the athletic coordinator as "hosting the party:"

> I always describe it as hosting the party. When there's a home event, I host it. I place out equipment that needs to be used. I welcome the visiting team. I take care of the officials, greet them, show them their locker room. I do game supervision. If things go wrong, I fix it. I hire ticket takers and security. I do crowd control. . . . Everything it might take to host an event.

(Pl.'s Dep. at 7.)   The athletic coordinator position is annually contracted as an assigned extra duty.  This is an at-will position with no obligation to be continued after the contract for extra-duty expires.  It is not a tenured position and is not associated with Plaintiff's teaching position or his tenure as a teacher.  In fact, the contract for extra duty pay in the amount of $7,977.06 signed by Plaintiff for the 2006-2007 school year provides that "[t]his contract for extra duty shall be for the period herein specified and continuing tenure shall not apply to said duties of extra duty or extra pay as herein set forth."  (Pl.'s Ex. 6, contract for 7/1/06 to 6/30/07 school year; Pl.'s Dep. at 7-8.)

### C.  Parents' Dispute with Basketball Coach Palmer

During the 2006-2007 school year, Plaintiff was Milford High School's athletic coordinator.  He also had a daughter who played on the Milford High School's girl's basketball team.  (Johnston Dep. at 37-38; Pl.'s Dep. at 31.)  Coach Palmer had had problems in the 2005-2006 season with some of his team's parents, specifically Mrs. Schultz, who, along with other parents, had prepared a list of grievances about Coach Palmer and had hired an attorney who took their grievances to the school superintendent. (Pl.'s Dep. at 31-32; Krystyniak Dep. at 25-27.)

### D.  Plaintiff's Removal as Principal's Designee on Hall of Fame Committee

Plaintiff also served on Milford High School's ten-member Hall of Fame Committee ("Committee") as the principal's designee for three years.  There is no pay, compensation or benefits involved.  Members vote, at the one meeting held each year, on which of Milford High School's past athletes nominated should be inducted to its Hall of Fame.  (Pl.'s Dep. at 10-12, 16-17, 28, 47.)

On September 19, 2006, without obtaining authorization from other Committee members or Principal Michael Krystyniak, Plaintiff sent a letter to Mrs. Debbie Schultz threatening to remove her from the High School's Hall of Fame, citing a by-law for removal of any inductee "due to conduct detrimental to the character and reputation of Milford High School and/or to the Hall of Fame." (Defs.' Ex. 7, 9/19/06 letter; Pl.'s Dep. at 16-18.) Plaintiff testified that he did so because letters had been written to the Hall of Fame Committee expressing concern about Mrs. Schultz's behavior toward the girl's basketball coach, Don Palmer, who Plaintiff concedes was a lifelong friend of his and the best man at his wedding. (Pl.'s Dep. at 13-15, 24, 30.) Plaintiff did not share these letters with the Hall of Fame Committee members. (Pl.'s Dep. at 16-17.) He did not send a copy of his letter to Mrs. Schultz to the Hall of Fame Committee members. (Pl.'s Dep. at 33.) He did not have authority from the Committee members, the Athletic Director, Sean Maloney, or Principal Krystyniak to send the September 19, 2006 letter to Mrs. Schultz. He explains that, although the Athletic Director, Sean Maloney, and Principal Krystyniak initially told him to hang onto the letter, he went ahead and sent it out after about ten days because they did not expressly tell him that he should not do so. (*Id.* at 17-20.) Plaintiff concedes there was nothing in the Committee By-Laws that authorized his conduct. (Pl.'s Dep. 17-20, 37.)

After receiving Plaintiff's letter, Mrs. Schultz contacted Principal Krystyniak, telling him that both she and her husband were extremely upset by the letter and that they had made complaints to the School District's athletic director, superintendent, and others. (Krystyniak Dep. at 19-20, 28, 34-35.) On the first Monday in October, the Hall of Fame Committee met. Principal Krystyniak attended, asked the Committee members if they had authorized or were aware of Plaintiff's letter to Mrs. Schultz, and was informed that they were not. It

was obvious at that early October meeting that Principal Krystyniak disapproved of Plaintiff's actions and was displeased with the conduct of the person who was acting as his designee on the Hall of Fame Committee. (Krystyniak Dep. at 17-21; Pl.'s Dep. at 33-35.)

After this Hall of Fame meeting on the first Monday in October 2006, Plaintiff filed the underlying lawsuit on his daughter's behalf in Oakland County Circuit Court.

On November 17, 2006, Principal Krystyniak sent Plaintiff a letter, notifying him that he would "no longer . . . be the principal's designee" or serve "in any other position on the Milford High School Hall of Fame Committee." (Defs.' Ex. 8, 9/17/06 letter.) Principal Krystyniak took this action because Plaintiff (1) sent the letter to Mrs. Schultz, giving the false impression that it was sent on behalf of the Hall of Fame Committee, and (2) "met with other parents of the girl's basketball team and brought them into [a] dispute [between the Schultz family, who in the past had children on the basketball team, and the basketball coach] and circulated a letter which [these parents] signed;" and (3) wore a T-shirt, while he was the school's Athletic Coordinator, thus instigating rather than seeking to resolve the basketball dispute (Krystyniak Dep. at 24-26, 50-51).

Plaintiff admits that, during the time he was Athletic Coordinator, he wore a T-shirt at some of the school basketball games with the basketball coach's attorney's name and phone number on it because "it made a statement that needed to be made." (Pl.'s Dep. at 31.) He explained that the T-shirt was in response to Mrs. Schultz's (1) organizing a meeting of some, but not all, of the team's parents, (2) preparing a list of grievances about the basketball coach, Don Palmer, and (3) hiring an attorney who took the grievances to the superintendent rather than following school policy and taking it to the coach first.

Plaintiff testified that "[t]he purpose of the T-shirt was to make the statement that anyone could hire a lawyer and defend themselves." (Pl.'s Dep. at 32.)

## C. Warnings to Plaintiff About His Role as Athletic Coordinator

Principal Krystyniak's November 17, 2006 letter to Plaintiff not only notified him that he would no longer serve as the Principal's designee on the Hall of Fame Committee. It also informed him that (1) his position as Athletic Coordinator was being changed so as to reduce his visibility, and (2) his "professional conduct" was being "placed under review for the remainder of the school year." (Defs.' Ex. 8.) The letter states, in its entirety:

Mr. Chuck Vereecke:

When you serve as athletic coordinator, it is as a representative of Milford High School and the Huron Valley Schools. The Athletic Coordinator must exercise sound judgment, appropriately represent Milford High School, and model supportive behavior for all our athletic programs. It is the opinion of the Board and the administration of the Huron Valley Schools that you have failed to model, utilize, or demonstrate the appropriate conduct necessary for the Athletic Coordinator position.

Sending denigrating correspondence to a Hall of Fame member without the prior approval or consent of the Hall of Fame Committee members was without justification and totally unacceptable. While serving as Athletic Coordinator, you have discussed and sought to inappropriately influence a dispute between a coach and a Milford High School family with school staff, parents and community members. This has been a disservice to our students, school and community. Your professional conduct was both reprehensible and irremediable.

Therefore, no longer will you be the principal's designee nor shall you be in any other position on the Milford High School Hall of Fame Committee. Your position as Athletic Coordinator has been changed with reduced "visibility" and your professional conduct placed under review for the remainder of the school year.

Public service requires that we work together to identify difficult problems and determine appropriate solutions. We trust that good judgment based in sound values will guide the way.

(Defs.' Ex. 8 (emphasis added).)  Dr. Teasdale, Executive Director of Human Resources for Huron Valley School District had some input in this November 17, 2006 letter. (Teasdale Dep. at 91-92.)  He explained that "reduced visibility" means Plaintiff "was not to have as visible a role in terms of operating the [athletic] event and that he was to have a reduced visibility in terms of how he operated and what role he had in the activities. . . By not being in charge of the event. . . we asked [Athletic Director] Maloney to reduce his visibility. . . responsibilities as well."  (Teasdale Dep. at 85.)  Dr. Teasdale further explained that the "professional conduct" referenced in the letter meant how Plaintiff handled himself as athletic coordinator.  (Teasdale Dep. at 54-55.)  This letter was the first written discipline that Plaintiff had received in over 30 years of teaching at Milford High School.  (Krystyniak Dep. at 6-7.)

In his affidavit, Athletic Director Sean Maloney avers that, in November 2006, he met with Principal Krystyniak, Dr. Teasdale, and Deputy Superintendent Nancy Coratti, and all three expressed their desire to remove Plaintiff as athletic coordinator.  (Maloney Aff. at ¶ 9.)

### D.  February 9, 2007 Half-Time Incident and March 19, 2007 Memo

On March 19, 2007, Dr. Teasdale met with Plaintiff and issued him a written reprimand for an incident that occurred on February 9, 2007, where Plaintiff became upset, publicly confronted the Lakeland High School athletic director at half-time at a varsity basketball game, and yelled profanities.  (Defs.' Ex. 9; Teasdale Dep. at 59-65.)  Plaintiff concedes that this incident occurred.  (Pl.'s Dep. at 65.)  Dr. Teasdale testified that Plaintiff admitted to him that (1) he knew that a group of students from each school would meet and shake hands at half-time on the basketball court to demonstrate good sportsmanship, (2) he

9

should have but did not inform the athletic director and principal about this, and (3) confronted the Lakeland athletic director and "blew his temper." (Teasdale Dep. at 60-64.)

Dr. Teasdale's March 19, 2007 memorandum to Plaintiff is as follows:

The Milford/Lakeland varsity basketball half-time incident on February 9, 2007 involving students from both schools has been reviewed with HVS staff. The intended display of good sportsmanship was not planned or approved by either Lakeland or Milford building administrators. Rather than good sportsmanship immature, competitive and disruptive behavior resulted.

During our discussion, you admitted to knowing about the student planned event, but did not inform building administration or provide appropriate structure to insure a positive activity. Building administration did a good job of redirecting the students and defusing upset adult fans. At this point, the in-person accounts also confirm that you confronted the Lakeland High School athletic director. It is agreed that you were highly animated and visibly upset. You admitted to being extremely upset with the Lakeland athletic director as a result of how you believe the incident should have been handled.

Your behavior was unsupportable as you failed to notify administration about the student-planned activity. In addition, you were publicly confrontational with a district administrator, failing to display and model appropriate decorum at a school event. As an athletic coordinator, you have an obligation to represent the district and your school with the professional self-control and collaborative problem-solving that supports best practice rather than the emotionally reactive behavior demonstrated.

Your student discipline perspective is based on your experience and should be shared in order to build positive relationships that instill best practice rather than an aggressive display that creates consternation and divisiveness.

(Defs.' Ex. 9, 3/19/07 Teasdale memo (emphasis added).) A February 9, 2007 incident report prepared by Greg Michaels, Lakeland High School Athletic Director, provides some background. The incident involves student activity concerning a photo of Milford High School basketball coach Don Palmer and Plaintiff's reaction to events that subsequently occurred:

Approximately 10-12 Milford students joined one Lakeland student at halftime to conduct a sportsmanlike handshake. The Lakeland student grabbed the poster

sized photo of Don Palmer, MHS BBK coach and ran into the LHS student section. The photo was launched into the LHS student section. One Milford student retrieved the photo weaving her way up the student section. As the Milford student was making her way down the bleachers, she lost her balance and fell into a LHS student. Former police officer, Rick Sharp, apparently grabbed both girls to prevent the situation from escalating.

* * * *

The halftime sportsmanship activity was orchestrated by Milford students. I was under the impression that the Milford administration was **not** aware of the activity. (It was mentioned that Chuck Vereecke may have authorized the handshake without informing the Milford administration) LHS administrators were not informed of the activity and were surprised to see students on the basketball court.

Lakeland parents reacted to Rick Sharp placing his hands on the LHS student. . . . Once things were cleared and somewhat under control, Chuck Vereecke approached me to discuss his concerns regarding the damaged Don Palmer photo. Chuck made his way to the LHS side of the gym. According to Susan Gallagher and Brad Farquhar, Chuck was rude, hostile and unprofessional in the manner he conducted himself. Chuck continuously screamed about how the picture had "sentimental value," after I calmly tried to tell him to "calm down" that this was not a "big deal." Throughout the second half, Chuck and his daughter, along with one other Milford student, acted out behind the scorers table (a section of the gym for authorized game workers . . . not students). According to Brad Farquhar, Chuck was seen pointing at the Lakeland side and saying "Fuck those guys." Unfortunately, this episode consumed most of the Milford AD's time in the second half.

* * * *

When Rick Sharp was being approached by one of the LHS parents, I intervened and deflected that parent from causing a scene. I protected the Milford GUY. So, I ask, why was Chuck allowed to approach me in a hostile manner? I believe this incident contributed to unsporting behavior by our parents and students and ultimately incited the crowd.

I am disappointed that a LHS student ran off with Don Palmer's photo; and hold this student responsible for his actions. However, there are definitely mitigating circumstances. The student was placed in a situation which allowed him to act in this manner and ultimately it was game management that failed to do its part. Although, in the heat of the moment, it was suggested that the student pay for the photo, I do not agree.

(Defs.' Ex. 9, G. Michaels 2/9/07 incident report.)

Plaintiff concedes that his tenure as a teacher, his compensation, and his benefits were not affected as a result of this memo. (Pl.'s Dep. at 50-51.)

### E. Non-Renewal of Plaintiff's Athletic Coordinator Contract

On June 13, 2007, Dr. Teasdale, Huron Valley Schools' Executive Director of Human Resources, hand-delivered a letter to Plaintiff advising him that his 2006-2007 athletic coordinator contract would not be renewed for the 2007-2008 school year. (Defs.' Ex. 11, 6/13/07 letter from Teasdale; Teasdale Dep. at 67-68.) Ms. Jacqueline Johnston, Superintendent of the Huron Valley School District, testified that she made this decision during the course of the school year but did not advise Plaintiff that his contract would not be renewed until his current contract expired. (Johnston Dep. at 25.) She made this decision because Plaintiff created controversy and concern rather than goodwill as evidenced by his behavior (1) in the Hall of Fame incident involving Mrs. Schultz, (2) in connection with a letter from parents of the Milford basketball team seeking to remove Mrs. Schultz as a spectator; and (3) during the February 9, 2007 Milford/Lakeland basketball game. (Johnston Dep. at 20-25, 37-38.) Dr. Teasdale recommended that Superintendent Johnston make this decision for these same reasons stated above after he wrote his March 19, 2007 memo. (Teasdale Dep. at 65-68.) Both Superintendent Johnston and Dr. Teasdale testified that the fact that Plaintiff had filed a lawsuit on behalf of his daughter did not have any bearing whatsoever on the decision not to renew his contract as athletic coordinator. (Johnston Dep. at 39-40; Teasdale Dep. at 70.)

Plaintiff concedes that this non-renewal had no effect on his status as a tenured teacher. (Pl.'s Dep. at 9-10, 52.) He claims, however, that the loss of approximately

12

$8,000 a year in extra-duty pay could affect his pension benefits, which are calculated using the salary from the individual's highest three years out of the last five. (Pl.'s Dep. at 77-78; Krystyniak Dep. at 78-79.)

### G. Plaintiff's Subsequent Removal of Pepsi Cooler From School

On June 14, 2007, Plaintiff cleaned out his belongings from his athletic coordinator office. (Pl.'s Dep. at 53-59.) Plaintiff concedes that he removed a Pepsi cooler from another part of the school and took it home because he believed it had been given to him by a Pepsi representative a few years earlier. He did not ask Principal Krystyniak or the athletic director if it was okay to take the Pepsi cooler off school property because they were not around when it was given to him. (Pl.'s Dep. at 59-63.)

In fact, the Pepsi cooler was one of six on loan to the Huron Valley School District from the Pepsi Bottling Company. (Defs.' Ex. 12, 6/14/07 police report.) Several school employees saw Plaintiff removing the Pepsi cooler and reported this to Principal Krystyniak. On Friday, June 15, 2007, Principal Krystyniak contacted the school liaison deputy from the Oakland County Sheriff's Department, Officer Dooley, explaining what he had been told. The Principal also called Dr. Teasdale and discussed what steps should be taken. After discussion with Officer Dooley and Dr. Teasdale, Principal Krystyniak called Sean Maloney, the School's Athletic Director, and learned that he had not given anyone permission to borrow the Pepsi cooler. Pepsi confirmed that they do not give away or loan out this equipment. Principal Krystyniak also went to Plaintiff's classroom and asked him if he had taken anything out of the building the previous day. Plaintiff replied that he had taken only his personal possessions, mentioning a microwave, refrigerator, and clothing. (*Id*; Krystyniak Dep. at 58-69; Teasdale Dep. at 73-79.) Principal Krystyniak then reported all

13

this information to Officer Dooley and asked him to investigate. He did not discuss it further with Plaintiff. (Krystyniak Dep. at 69-73.)        Officer Dooley contacted a detective who determined that they would go out to Plaintiff's home and talk to Plaintiff. When they arrived at Plaintiff's home, they saw the Pepsi cooler in his open garage, issued him a citation for larceny, and recovered the Pepsi cooler. (Teasdale Dep. at 79; Pl.'s Ex. I, ticket.) Dr. Teasdale testified that any time it is reported that a school employee has taken property from a school, the School District proceeds with charges, allowing the police to investigate and prepare a report. The police then take the matter to the prosecutor who decides whether to proceed further. (Teasdale Dep. at 80-81, 83-84.) He also testified that Plaintiff's lawsuit on behalf of his daughter had nothing to do with the decision to go forward with this criminal investigation. (Teasdale Dep. at 82.) Principal Krystyniak likewise testified that Plaintiff's lawsuit played no role in his decision to contact Officer Dooley regarding the investigation into the removal of the Pepsi cooler from school property. (Krystyniak Dep. at 89-90.) The Oakland County prosecutor decided not to prosecute this matter. An investigation like this would not cause a teacher to lose his job, but a conviction would. (Krystyniak Dep. at 88.)

### H.  Plaintiff's State Court Action Settles and This Suit is Filed

At the close of discovery, Plaintiff's lawsuit, filed on behalf of his daughter, was evaluated for $31,000 ($30,000 against the former teacher and $1,000 against the District and Principal Krystyniak). All parties accepted the case evaluation award, and the lawsuit was dismissed with prejudice on August 6, 2007. (Defs.' Ex. 3.) On August 31, 2007, Plaintiff filed this action.

This matter is before the Court on Defendants' motion for summary judgment, arguing that (1) the underlying lawsuit did not raise matters of public concern and thus was not speech protected by the First Amendment, (2) Plaintiff has not presented evidence showing that there is a genuine issue of material dispute that Defendants retaliated against Plaintiff for filing the underlying lawsuit on his daughter's behalf, (3) the individual Defendants are immune from § 1983 liability; and (4) Plaintiff has failed to state a claim for relief against Defendant School District.

## II.  Summary Judgment Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must

set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

### A.  Individual Liability

Plaintiff is a public school teacher and thus a public employee alleging that he was retaliated against for filing a lawsuit on his daughter's behalf against another public school teacher, the School District, and his daughter's high school principal. "While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, . . . a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (internal citations omitted).

The Sixth Circuit "has established a three-step process for evaluating a public employee's claim of unlawful retaliation." *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003). The three steps are as follows:

> First, the employee must establish that his speech is protected. To accomplish this, the employee must show that his speech touches on a matter of public concern and demonstrate that his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer. This determination is a question of law for the court to decide. Second, the employee must show that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights. Finally, the employee must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss.

*Id.* (internal citations omitted). The Court begins its analysis with the first prong of this three-step inquiry – does Plaintiff's speech as communicated in the underlying lawsuit brought on behalf of his daughter touch on a matter of public concern.

### 1. Matter of Public Concern

Despite Defendants' arguments otherwise, Plaintiff's underlying lawsuit brought on behalf of his daughter contains speech that touches on matters of public concern. Plaintiff was not speaking as a public school employee on a matter only of personal interest like his continued employment. Rather, in addition to seeking money damages for his daughter, the underlying lawsuit communicated that a public school teacher's physical contact with a female student was too rough, that the school's Principal had earlier complaints from other female students about this same teacher's inappropriate comments of a sexual nature, and both the Principal and the School District failed to properly investigate and discipline this public school teacher, thus allowing him to continue inappropriate contact with female students that resulted in Plaintiff's daughter's broken wrist in an misguided attempt at "horseplay" between an adult male teacher and a female student. This is the sort of information the community would be interested in receiving. "[T]he First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information." *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 896 (6th Cir. 2003) (internal quotations and citation omitted). Moreover, Plaintiff's entire speech in the underlying lawsuit need not address matters of public concern "as long as some portion of the speech does." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 257 (6th Cir. 2006) (internal quotation marks and citation omitted). As stated more fully by Sixth Circuit in *Scarbrough*:

[W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. Moreover, the entire speech does not have to address matters of public concern, as long as some portion of the speech does so.

470 F.3d at 256-57 (internal quotations and citation omitted).

The Court must now determine whether Plaintiff's interest as a citizen commenting on matters of public concern outweighs the government's countervailing interest in promoting the efficiency of the public services that it provides through its employees. *Id.* at 255, 257 (citing the balancing test announced in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)). "Speech and conduct that occur outside the office walls and that do not relate to work interfere less with office efficiency than conduct that occurs inside the office or that relates to the employee's work." *Id.* at 256-57. Plaintiff's speech in the underlying suit did not relate to his work as a public school teacher. It did not occur at work or during work hours. Accordingly, application of the *Pickering* balancing test weighs in Plaintiff's favor.

Although Plaintiff's speech in the underlying lawsuit is constitutionally protected, the Court must also consider the remaining elements of his First Amendment retaliation claim. It does so here.

## 2. Was Protected Speech a Substantial or Motivating Factor in Adverse Employment Actions -- Causation

"[A]n employee must demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action. Specifically, the employee must point to specific, nonconclusory allegations reasonably linking [his] speech to employer discipline." *Rodgers*, 344 F.3d at 602 (internal quotations and citations omitted).

Plaintiff argues that his filing the underlying lawsuit on behalf of his daughter was a substantial or motivating factor in: (1) his written discipline on November 17, 2006 in connection with the Hall of Fame letter to Mrs. Schultz; (2) his written discipline on March 19, 2007 in connection with the February 9, 2007 incident at the Huron Valley/Lakeland basketball game; (3) the decision not to renew his contract as athletic coordinator for the 2007-2008 school year thus depriving him of extra-duty pay of approximately $8,000 a year; and (4) the decision to involve the police in a criminal investigation in connection with his June 2007 removal of the Pepsi cooler from school property. Defendants' motion for summary judgment argues that Plaintiff has not and cannot present sufficient evidence to create a genuine issue that the underlying lawsuit was a substantial or motivating factor in any of the challenged actions. Assuming, without deciding, that each of these identified adverse actions would be sufficient to chill protected speech, this Court agrees with Defendants on the issue of causation.

There is no admission or direct evidence of retaliation – that Plaintiff's speech in the underlying lawsuit filed on his daughter's behalf was a substantial or motivating factor for any of the challenged adverse employment actions. It is not disputed that Plaintiff was disciplined after he filed the lawsuit on behalf of his daughter. This fact alone, however, is not enough to support a reasonable inference of causation -- that the lawsuit was a substantial or motivating factor in any of the employment decisions Plaintiff challenges. As recently observed by the Sixth Circuit, "[t]his circuit has held that the non-moving party cannot rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, to survive a motion for summary judgment, the employee must present sufficient evidence linking his speech to the employer's adverse

decision so that a reasonable factfinder could conclude, by a preponderance of the evidence, that the speech, at least in part, motivated the [adverse employment decision]." *Taylor*, 338 F.3d at 646 (internal quotations and citations omitted).  Plaintiff has not done that here.  Even if (as Athletic Director Maloney avers in his affidavit at paragraph 9) Principal Krystyniak, Dr. Teasdale, and Deputy Superintendent Coratti discussed the removal of Plaintiff as athletic coordinator as early as November 2006, this does nothing to advance Plaintiff's argument that retaliation for his protected speech was Defendants' motivation for issuing him a written discipline in November 2006 and March 2007 and for not renewing his contract for athletic coordinator in June 2007.  This is nothing more than an argument that, because removal of Plaintiff as athletic coordinator was discussed after the underlying suit was filed, it must have been motivated by a desire to retaliate.  As discussed above, temporal proximity in this context is not enough.

Each decisionmaker involved in the challenged adverse employment actions -- Superintendent Johnston, Principal Krystyniak, and Dr. Teasdale – testified that Plaintiff's filing of a lawsuit on his daughter's behalf in October 2006 was not a substantial or motivating factor in their decisions.  (Johnston Dep. at 30-31, 39-40, Teasdale Dep. at 70, 82; Krystyniak Dep. at 89-90.)  Athletic Director Maloney's subjective beliefs otherwise are inadmissible.  (*See* Maloney Aff. at ¶¶ 11-12 averring that it is his belief that Plaintiff's conduct did not warrant non-renewal of his athletic coordinator contract for 2007/2008 and further averring that it is his belief that Plaintiff's filing of the underlying lawsuit was a motivating factor in that non-renewal.)  Maloney was not a decisionmaker with regard to Plaintiff's written discipline or the decision not to renew Plaintiff's athletic coordinator contract.  He did not investigate Plaintiff's conduct or have all the information considered

by the decisionmakers in connection with the Hall of Fame and February 9, 2007 incidents that gave rise to Plaintiff's discipline and non-renewal. Because he was not a decisionmaker and did not have all the information available to the decisionmakers, Athletic Director Maloney is not competent to testify as to the wisdom of their decisions. Rule 56(e) requires that an opposing affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). *See also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992). Maloney's subjective beliefs do not satisfy these requirements.

Moreover, Plaintiff admits the core conduct upon which his discipline and non-renewal are based. As to Plaintiff's November 17, 2006 discipline letter, Plaintiff concedes that he sent the Hall of Fame letter to Mrs. Schultz without express prior approval or consent from the Hall of Fame Committee members, Principal Krystyniak, or Athletic Director Maloney. That he previously showed the latter two the letter does not change the fact that they did not expressly authorize Plaintiff to send it to Mrs. Schultz – a fact Plaintiff admits and the fact upon which Plaintiff's November 17, 2006 discipline letter was founded. Plaintiff also concedes that there was nothing in the Committee's By-Laws that authorized his conduct – another fact upon which that discipline letter was based.

Plaintiff also concedes that, while serving under contract as the school's athletic coordinator, he became involved in a dispute between Mrs. Schultz and other parents of the High School's basketball players and Don Palmer, the basketball coach who was also his long-time friend and best man at his wedding. He admits that, while he was the athletic coordinator, he wore a T-shirt to some basketball games that was intended to send a

negative message in response to Mrs. Schultz and to other parents who had hired an attorney to present their grievances against Coach Palmer to the school superintendent.

As to Plaintiff's March 19, 2007 discipline memo, Plaintiff concedes that, while he was serving under contract as the school's athletic coordinator, he publicly confronted the athletic director from the opposing team, Gregory Michaels, at a high school basketball game between Huron Valley High School and Lakeland High School on February 9, 2007. Lakeland High School is part of the Huron Valley School District and its employees are under Dr. Teasdale's authority as Executive Director of that School District's Human Resources. (Teasdale Dep. at 59.) Unlike Plaintiff, Mr. Michaels did not receive a written discipline as a result of the February 9, 2007 incident. (Teasdale Dep. at 64.) Plaintiff argues that this disparate treatment for the same conduct is sufficient evidence to link his protected speech in the underlying lawsuit to the March 19, 2007 discipline so that a reasonable factfinder could conclude, by a preponderance of the evidence, that Plaintiff's speech, at least in part, motivated the decision to discharge. Plaintiff argument fails because the evidence submitted shows that Plaintiff was disciplined for conduct that was <u>not</u> the same as Mr. Michaels' conduct. Although Mr. Maloney avers that he was the one who separated Plaintiff and Mr. Michaels and witnessed both equally raising their voices in the verbal confrontation (Maloney Aff. ¶¶ 6-8), he fails to address one of the key factors for Plaintiff's written discipline of March 19, 2007; i.e., that Plaintiff had prior knowledge of the student-planned event but did not inform building administration or provide appropriate structure to insure a positive activity. (Defs.' Ex. 9, 3/19/07 Teasdale memo.) The memo expressly notifies Plaintiff that his behavior, while acting in his role as athletic coordinator, "was unsupportable as you failed to notify administration about the student-planned

activity." (*Id.*) It goes on to inform Plaintiff that "[i]n addition, you were publicly confrontational with a district administrator, failing to display and model appropriate decorum at a school event. As an athletic coordinator, you have an obligation to represent the district and your school with the professional self-control and collaborative problem-solving that supports best practice rather than the emotionally reactive behavior demonstrated." (*Id.*) Contrary to Plaintiff's arguments here, he and Mr. Michaels did not receive disparate treatment for the <u>same</u> conduct.

As to the Pepsi cooler incident, Plaintiff admits that he took the cooler from school property without first asking or informing Principal Krystyniak or Athletic Director Maloney before he did so. Plaintiff's honest belief that the property was his does nothing to refute Defendants' evidence that, whenever it is reported that property has been removed from the school by a school employee, the matter is turned over to the police for investigation. Plaintiff has not come forward with evidence rebutting that evidence. Plaintiff concedes that the matter was investigated and that criminal charges were not pursued by the Oakland County Prosecutor's office. Other than the fact that this investigation occurred roughly eight months after the underlying lawsuit was filed, Plaintiff presents no evidence showing that the underlying lawsuit filed on his daughter's behalf was a substantial or motivating factor for the criminal investigation.

In sum, Plaintiff concedes all the critical facts that the decisionmakers provided for disciplining him in his role as athletic director and as the Principal's designee on the Hall of Fame Committee, for not renewing his at-will contract for athletic coordinator for the 2007/2008 school year in June 2007, and for asking the school liaison deputy to investigate a report that property was removed from the school by a school employee.

23

Considering all of the above, Plaintiff has not shown that a genuine issue of material fact exists whether Plaintiff's exercise of his First Amendment rights was a substantial or motivating fact in the challenged adverse employment actions – it was not. Accordingly, Defendants' motion for summary judgment as to Plaintiff's § 1983 First Amendment retaliation claims against the individual Defendants is granted, and the claims are dismissed.

### B. Municipal Liability

To defeat summary judgment on his remaining § 1983 claim of municipal liability, Plaintiff must present evidence that Defendant Huron Valley School District, the municipal Defendant, is responsible for retaliating against him because of his exercise of his First Amendment free speech rights. Plaintiff cannot base his claims against Defendant School District solely on the individual Defendants' conduct because "*respondeat superior* is not available as a theory of recovery under section 1983." *Doe v. Claiborne County*, 103 F.3d 495, 407 (6th Cir. 1996) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978)). "Rather, [he] must show that the School District *itself* is the wrongdoer." *Id.* (emphasis in original). "Under *Monell*, the. . . School Board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom with the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.* Plaintiff must also "show that the particular [constitutional] injury was incurred *because* of the execution of that policy." *Id.* (internal quotation and citation omitted). "This requirement is necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell. Id.*

Thus, as the Sixth Circuit recently observed, to hold the municipal Defendant liable, Plaintiff must: "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [the plaintiff's] particular injury was incurred due to the execution of that policy." *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (internal quotation and citation omitted).

Plaintiff attempts to satisfy this burden by arguing that the decisionmakers – Superintendent Johnston, Dr. Teasdale, and Principal Krystyniak – were also the District's policymakers in this matter. This does not help Plaintiff as this Court has determined that these individual Defendants did not violate Plaintiff's constitutional rights under the First Amendment. Accordingly, Plaintiff cannot rely on that same conduct to satisfy its burden for establishing a claim of municipal liability. Likewise, Plaintiff's burden is not satisfied with a statement in the November 17, 2006 discipline letter from Principal Krystyniak that "[i]t is the opinion of the Board and the administration of the Huron Valley Schools that you have failed to model, utilize, or demonstrate the appropriate conduct necessary for the Athletic Coordinator" and statements by members of the Board of Education to Athletic Director Maloney that they felt Plaintiff was "thumbing his nose" at the Board. (Defs.' Ex. 8, 11/17/06 letter; Maloney Aff. ¶ 10.) Contrary to Plaintiff's arguments here, there is simply no evidence that the Huron Valley School District policymakers adopted a custom, practice, or policy of retaliating against teachers who filed lawsuits similar to the one that Plaintiff filed on behalf of his daughter. Accordingly, Defendants' motion for summary judgment as to Plaintiff's municipal liability claim is granted, and the claim is dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 14, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 14, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager